**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| JEFFERY L. ANDERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:23-CV-00201 SNLJ |
| | ) | |
| JOSEPH T. HERNANDEZ, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

Self-represented plaintiff Jeffery Anderson, an inmate currently incarcerated at Southeast Correctional Center (SECC), brings this action under 42 U.S.C. § 1983 for alleged violations of his civil rights. The matter is before the Court upon the motion of plaintiff for leave to proceed in forma pauperis, or without prepayment of the required filing fees and costs. [ECF No. 2]. Having reviewed the motion and financial information, the Court will grant the motion and assess an initial partial filing fee of $1.00. *See* 28 U.S.C. § 1915(b)(1). For the reasons discussed below, the Court will issue process on plaintiff's claim that defendants Wes Drury and Amy Johnson were deliberately indifferent to his serious medical needs when they failed to give him his prescribed medication after February 4, 2019, at Scott County Jail. Plaintiff's remaining claims in this lawsuit, however, will be dismissed. *See* 28 U.S.C. § 1915(e)(2)(B).

### Initial Partial Filing Fee

Pursuant to 28 U.S.C. § 1915(b)(1), a prisoner bringing a civil action in forma pauperis is required to pay the full amount of the filing fee. If the prisoner has insufficient funds in his or her prison account to pay the entire fee, the Court must assess and, when funds exist, collect an initial partial filing fee of 20 percent of the greater of (1) the average monthly deposits in the prisoner's account, or (2) the average monthly balance in the prisoner's account for the prior six-month

period. After payment of the initial partial filing fee, the prisoner is required to make monthly payments of 20 percent of the preceding month's income credited to the prisoner's account. 28 U.S.C. § 1915(b)(2). The agency having custody of the prisoner will forward these monthly payments to the Clerk of Court each time the amount in the prisoner's account exceeds $10, until the filing fee is fully paid. *Id.*

Plaintiff has failed to submit a prison account statement. As a result, the Court will require plaintiff to pay an initial partial filing fee of $1.00. *See Henderson v. Norris*, 129 F.3d 481, 484 (8th Cir. 1997) (when a prisoner is unable to provide the Court with a certified copy of his prison account statement, the Court should assess an amount "that is reasonable, based on whatever information the court has about the prisoner's finances."). If plaintiff is unable to pay the initial partial filing fee, he must submit a copy of his prison account statement in support of his claim.

**The Complaint and Supplemental Documents Provided by Plaintiff**

Plaintiff Jeffery Anderson, who is currently incarcerated at SECC in Charleston, Missouri, filed the instant action alleging violations of his civil rights prior to and during his incarceration at Scott County Jail in Benton, Missouri. He brings this action pursuant to 42 U.S.C. § 1983. Plaintiff names as defendants in this action Joseph Telker-Hernandez (Counselor, Missouri Medical Center in Sikeston, Missouri), Amy Johnson (Jail Administrator, Scott County Jail) and Wes Drury (Sheriff, Scott County). Plaintiff sues defendants in both their individual and official capacities.

Plaintiff's claims arise from events that arose both prior to, and after, he murdered his girlfriend,[1] Jennifer Midgett, which occurred on January 15, 2019.[2] He claims that on or about

---

[1] Plaintiff refers to the decedent, Jennifer Midgett, as both his wife and his girlfriend in the complaint. After reviewing the criminal case detailing the facts relative to the charges of Ms. Midgett's murder, it appears that Ms. Midgett and plaintiff had several children together and lived together for several years. It is unclear if plaintiff and Ms. Midgett were legally married. The Court will refer to Ms. Midgett as his girlfriend for the purposes of this Order.

[2] The facts are taken from plaintiff's complaint and the attached exhibits, ECF No. 1. Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, "A copy of a written instrument that is an exhibit to a

2

April 23, 2019, both he and Jennifer Midgett, went to Bootheel Counseling Services in Sikeston, Missouri, to see a therapist by the name of Elizabeth Engram. Engram is not a named plaintiff in this lawsuit, nor is Bootheel Counseling Services, which is a private, non-profit organization.[3]

At the Bootheel Counseling Services, plaintiff reported that he needed "anger management" and to "live his life without paranoia." He reported that he frequently accused Midgett of being unfaithful, and he often suffered from auditory hallucinations, intense anger outbursts, irritable moods and periods of risk-taking behaviors. Plaintiff further reported that he had prior legal problems due to substance abuse, had lost jobs due to anger outbursts, and had experienced suicidal thoughts in the days prior to his visit to the counseling center. However, he stated that he did not have firearms in his home with which he could commit suicide or hurt another person. Engram recommended that plaintiff participate in biweekly individual therapy sessions and pursue an appointment with the medical clinic for psychiatric medication. There is no indication in the complaint as to whether plaintiff continued therapy or followed up at the medical clinic.

On September 16, 2018, however, plaintiff states that he was admitted to Southeast Health Center in Dexter, Missouri, due to "suicidal-homicidal" thoughts. A psychiatric evaluation was conducted by Dr. Pavan Palepu on September 17, 2018. Dr. Palepu indicated in the report that plaintiff checked into the voluntary unit with increased depression. He indicated that he had a plan

---

pleading is part of the pleading for all purposes." The Court also takes judicial notice of documents filed in plaintiff's criminal proceedings on Missouri Case.Net. *See Levy v. Ohl,* 477 F.3d 988, 991 (8th Cir. 2007) (explaining that district court may take judicial notice of public state records); *Stutzka v. McCarville,* 420 F.3d 757, 760 n.2 (8th Cir. 2005) (stating that courts "may take judicial notice of judicial opinions and public records).

[3] According to plaintiff's complaint, he had visited with a therapist at Bootheel Counseling Services in December of 2018, as well. In his complaint and the accompanying exhibits, plaintiff states that he saw Licensed Counselor Chris Hummel at the Center on November 28, 2018, and December 10, 2018. In November of 2018, he complained to Hummel he was hallucinating almost daily, but he did not have enough money to afford his psychiatric medications.

to hang himself but reported that his children had stopped him from following through. Plaintiff admitted to a long history of alcohol use and depression, and although he would only admit to having a one-day drinking binge prior to his immediate admission, he required several medications for anxiety, depression, mood stabilization and hypertension. Plaintiff voluntarily removed himself from the facility after only one day, and he was sent home with psychiatric diagnoses of substance induced mood disorder and schizophrenia. He was advised to follow the specified aftercare plans of following up with his counselor.

On January 3, 2019, at approximately 12:15 a.m., plaintiff was taken from his mother's home by ambulance to the Missouri Delta Medical Center in Sikeston, Missouri, allegedly due to thoughts of harm to both himself and others. Although plaintiff claims that he reported that he was both suicidal and homicidal the day he went to the hospital on January 3, 2019, the contemporaneous notes taken by the mental health professional at Missouri Delta Medical Center indicate otherwise.

Plaintiff has attached to his complaint the notes of Licensed Professional Counselor, Joseph Telker-Hernandez, who did an evaluation of plaintiff at 4:10 a.m. to see if a 96-hour hold should be placed on plaintiff. In the notes attached to the complaint compiled by Telker-Hernandez, Telker-Hernandez indicates that although plaintiff was making generalized threats of harm to himself, he did not have a specific plan to commit suicide. At that time, his plans were "unknown." Plaintiff alternated when pressed that he could possibly see himself committing suicide with "pills;" however, he specifically told Telker-Hernandez that he did not have any pills to take and if necessary, he could get some "somewhere." Additionally, he reported that he had no prior suicide attempts, and he stated that he did not do anything to hurt others. Plaintiff further reported *that he was not homicidal*, and there was no one with whom he was angry or had a history or violence. (emphasis added)

4

Plaintiff also told Telker-Hernandez that he was hearing voices because he ran out of his medication for his current diagnoses for bipolar disorder and schizophrenia. Telker-Hernandez wrote on the assessment form that plaintiff appeared jovial, lucid, participatory and smiling. In fact, plaintiff indicated that he felt safe with his sister and his mom, and his mom could pick him up from the hospital. When Telker-Hernandez reached out to plaintiff's mom over the phone, plaintiff's mom agreed to the plan. Plaintiff reported that he had become depressed because he had drunk "9 beers and [was] not used to that."

After the assessment, Telker-Hernandez wrote that plaintiff should *not* be placed on a 96-hour hold, that plaintiff was not a danger to himself or others, that he had a follow-up appointment already scheduled with a Nurse Practitioner at Bootheel Counseling Services on January 7, 2019, and plaintiff agreed to go to that appointment.  However, plaintiff was told to follow-up with his crisis team at Bootheel Counseling Services as well. In fact, Telker-Hernandez specifically noted in the medical file that plaintiff was currently seeing counselor Chris Hummel at the Bootheel Counseling Services. It is not clear if plaintiff followed up with his counselor or the Nurse Practitioner at Bootheel Counseling Services after his visit to Missouri Delta Medical Center. As noted above, approximately twelve (12) days after plaintiff was seen by Telker-Hernandez, plaintiff shot and killed Jennifer Midgett.

Despite the findings of Telker-Hernandez in the report he generated on January 3, 2019, at the Missouri Delta Medical Center in Sikeston, Missouri, plaintiff appears to argue in his complaint that Telker-Hernandez' failure to admit him to the hospital on a 96-hour hold on the night of January 3, 2019, was negligent. In his request for relief, he requests that the Court award him monetary relief and hold Telker-Hernandez liable because "a crime was committed that could have been prevented." In direct contravention to the report plaintiff has attached to his complaint from Telker-Hernandez, plaintiff alleges that "plaintiff and his family requested to place the

plaintiff in a mental hospital which the mental health doctor denied the request." Plaintiff asserts

that he would not be "where he is today" if Dr. Joseph T. Hernandez would have acted – took

action on 01-03-2019 when the plaintiff plainly told the doctor (now defendant) that he (plaintiff)

was in fact [] having suicidal and homicidal thoughts…"

Plaintiff next asserts that after he was arrested for the crime of killing Jennifer Midgett, his

Fourteenth Amendment rights were violated when Scott County Jail Administrator Amy Johnson

and Sheriff Wes Drury failed to provide him proper treatment for his psychiatric diagnoses. He

asserts that after he killed Jennifer Midgett, he was taken to the Scott County Jail in Benton,

Missouri, and placed "under the supervision" of Johnson and Drury. Plaintiff states in a conclusory

manner that he was:

> held in a jail cell with a camera on him – from 01-15-2019 to 01-28-2019 – 'a total
> of thirteen days' before Amy Johnson and Wes Drury took any action for mental
> health help for plaintiff.

Plaintiff's complaint, however, is devoid of any factual assertions of what exactly occurred to him

during these thirteen (13) days at the Scott County Jail. In his complaint plaintiff states simply:

> For thirteen days (before being transported) he was being held in a strip-suicide cell
> with no visits; no phone calls, no type of medications; plaintiff suffered from denial
> of mental health treatment (medications), suffered from evidence of pain,
> humiliation, emotional distress, mental anguish, nightmares, and memory loss.

Plaintiff states in his complaint that on or about January 28, 2019, defendant Drury ordered

defendant Johnson to "get help" for plaintiff, and Angela Lutmer, a Licensed Professional

Counselor from Bootheel Counseling Services, came to the Scott County Jail to speak to plaintiff.

However, that does not exactly coincide with the notes plaintiff has provided from Lutmer which

he has attached to his complaint. As noted above, this Court takes judicial notice of these notes in

conjunction with Federal Rule of Civil Procedure 10(c).

In Lutmer's January 24, 2019, notes, Lutmer indicates that she spoke by phone on that date

with the medication clinic coordinator at the Scott County Jail, Edie Eeftink. It appears that

plaintiff's sister had called the Jail's clinic coordinator to inquire about getting plaintiff placed on psychiatric medications. Eeftink then called Lutmer regarding the same, and Lutmer called a nurse at the Scott County Jail to check on plaintiff. There is no indication in the notes as to what plaintiff's condition was on January 24, 2019, however.

On January 28, 2019, Lutmer went to the Scott County Jail to meet with plaintiff in person "at the request of the jail because client appears very depressed and asked to be hospitalized for psychiatric reasons." Lutmer reports that at that time she assessed plaintiff's functioning, and he was reporting that he was having visual and auditory hallucinations which were telling him to kill and/or hurt people. Plaintiff was also suffering from suicidal thoughts, but he did not want to discuss his suicidal thoughts with Scott County Jail staff because he was afraid that he would be placed in a "suicide cell." Although plaintiff states in his complaint that he had already been placed in a "suicide cell" at Scott County Jail immediate upon being placed in the Jail, this is in direct contravention to his report to Angela Lutmer on January 28, 2019.

Plaintiff relayed to Lutmer that he had a history of suicide attempts by overdose, and his current thoughts were attempting suicide by overdose. He admitted, however, that he had no access to pills at Scott County Jail. Lutmer noted that plaintiff had a flat affect and depressed mood, and she wrote that plaintiff sought to be admitted to the hospital and placed on medications. He reported that he had previously been hospitalized at Southeast Health in Stoddard County in 2018, and she noted that plaintiff had taken the following medications for his mental difficulties in the past: Seoquel, BusPar and Vistaril – although plaintiff reported that he never started Buspar due to the cost of the medication. When Lutmer went to leave Scott County Jail, she spoke with a nurse and Jail Administrator Johnson, regarding "AVH [auditory verbal hallucinations] and SI [suicidal ideations]." Lutmer determined that she would petition for a 96-hour hold for plaintiff in Biggs-Fulton State Hospital, and until that time, plaintiff would be kept in his cell with video surveillance.

Plaintiff was transported to Fulton State Hospital for a psychiatric evaluation, on a 96-hour hold, on January 29, 2019, and he underwent the assessment the next day. He was assessed by Dr. Naveen Yarasi, who compiled a five-page report. However, plaintiff has submitted only two pages of that report to the Court as an exhibit to his complaint.

At the time of plaintiff's admission to Fulton, plaintiff was thirty-five (35) years old. Dr. Yarasi stated that plaintiff was calm and cooperative during his interview, and he reported that the reason for his hospitalization was "hallucinations and [he] was having suicidal and homicidal thoughts." Plaintiff reported that he started hearing voices around the age of 26, which were initially sporadic, but the symptoms gradually worsened in approximately 2018. At that time, he started hearing multiple voices telling him negative things about himself, calling him worthless and making him feel paranoid. Plaintiff also reported seeing human faces on the walls. In August of 2018 he was admitted to Southeast Missouri Behavioral Health Center in Dexter, Missouri, for approximately five (5) days and was prescribed Vistaril and Seroquel in the hospital. In October of 2018, he started seeing Nurse Practitioner Sheryl Teachenor at Bootheel Counseling Services who prescribed 100 milligrams of Seroquel at bedtime and BusPar for anxiety. However, he stopped taking the medications after a month. Plaintiff told Dr. Yarasi that he had been off his psychotropic medications for approximately one and a half months. He reported that on January 6, 2019, he went to the Emergency Room in Sikeston because he was hearing voices, but they did not admit him to the psychiatric unit. Additionally, he had been in jail since January 15, 2019, and had not been on psychotropic medications since being in jail.

Plaintiff told Dr. Yarasi that he had a depressed mood for the past five to ten days. During this period, he reported sleeping excessively, having poor motivation, lack of appetite, poor concentration and lack of energy. He reported to Dr. Yarasi that his mood was currently "up and down." Plaintiff reported having suicidal thoughts for several weeks and feeling hopeless, mainly

due to his criminal charges. He said, "I feel suicidal for what I have done and something that I can't take back." However, he denied having active suicidal ideation, intent or plan. He stated he wanted to live for his children. He reported one suicide attempt in 2008 where he took ten to fifteen Ambien tablets, but he did not seek medical care. Last, he admitted to having some episodes of increased mania, approximately five to six episodes per month. He denied, however, having panic attacks.

Plaintiff was discharged from Fulton State Hospital and taken back to Scott County Jail on February 4, 2019. It was noted in his discharge papers that he had been off all suicide precautions since January 31, 2019; thus, he was only on suicide precautions at Fulton for approximately two days. Plaintiff was released on one anti-psychotic drug called Haldol. He was also instructed to take two blood pressure medications, Lisinopril and Amlodipine, a diuretic called Hydrochlorothiazide, Zantac for GERD, and an anti-seizure medicine called Lamictal. Under the "Physician Comments" portion of plaintiff's discharge papers, the notes stated, "Do not provide patient with objects that he can use to hurt himself. He needs to take his medication as prescribed. He needs to be followed up by a psychiatrist and internist for medication management."

On February 11, 2019, Angela Lutmer made a progress note regarding plaintiff stating:

Clinician was informed by nurse at Scott County Detention Center that client was back from Fulton, had started medications and appeared to be doing better. Client is concerned about continuing medications if he is transferred to a new jail due to change in venue on his court case.

Plaintiff has not included any additional notes from Lutmer with his complaint, nor any other personnel at the Bootheel Counseling Services.

Plaintiff states in his complaint, however, that when he returned to Scott County Jail on February 4, 2019, he was placed in a "suicide watch cell." The Court notes that plaintiff has not described the "suicide watch cell" and how this cell allegedly differed from a regular "suicide cell." Nonetheless, he claims that for "multiple days" he did not receive his medications. When he

asked defendant Johnson about his medication, Johnson told him that she was waiting for Drury to approve the Jail's nurse to give plaintiff the medication. Plaintiff specifically states that fifteen (15) days went by before "The Jail" approved the nurse to give plaintiff his needed medication. On April 10, 2019, plaintiff was transferred from the Scott County Jail to the Butler County Jail where he continued to receive his medication and mental health treatment.

In sum, plaintiff alleges a negligence/medical malpractice claim against defendant Dr, Joseph Telker-Hernandez for failing to admit him to the hospital on a 96-hour hold on the night of January 3, 2019. He next alleges that defendants Amy Johnson, the Jail Administrator at Scott County Jail, as well as Wes Drury, the Sheriff, acted with deliberate indifference to his serious medical needs in violation of the Fourteenth Amendment by: (1) keeping him in what appears to be a suicide cell with a camera on him for approximately thirteen (13) days but failing to reach outside the Jail for mental health treatment between January 15, 2019 and January 28, 2019; and (2) for failing to provide him the proper medications when he returned from Fulton State Hospital on February 4, 2019, which went on for approximately fifteen (15) days. Plaintiff additionally asserts that he was denied access to the Court because unknown persons at Scott County Jail would not provide him with a pencil when he was in the "suicide watch cell" or allow him to go to the law library.

Plaintiff seeks monetary damages only.

**Plaintiff's State Court Criminal Case**

A warrant was issued for plaintiff's arrest on the date of Jennifer Midgett's murder, January 15, 2019. *State v. Anderson*, No. 19SO-CR00038 (33rd Jud. Cir., Scott County Court). An accompanying criminal complaint was issued against plaintiff on January 16, 2019, charging plaintiff with felony murder in the first degree, armed criminal action and unlawful use of a

weapon. *Id*. The probable cause statement, completed by Detective Bobby Sullivan of the Sikeston

Police Department, stated as follows:

> On Tuesday 01-15-2019, at approximately 1340 hours Alexis Owens arrived at Sikeston Department of Public Safety Headquarters and told Det. Josh Golightly that she witnessed a murder at a white house on Kendall Street near the railroad tracks. Owens said that her friend was just shot by her boyfriend Jeffrey Anderson. It was later learned that [JM] and Anderson have had a twelve-year romantic relationship and have several children in common. When Officers arrived there were shell casings in the front yard, front porch and doorway of the residence. The front door of the residence (509 Kendall Street) was open and they found [JM] lying in the kitchen floor on her back deceased from what appeared to be at least four gunshot wounds to the head area, chest and leg.

> Owens was interviewed by Detectives and told them that [JM] and Anderson started arguing last night (01-14-2019) while they were having friends and family over for their 10-year-old son's birthday party. Owens said that during the argument Anderson tells [JM] that he will kill her. Owens said that the argument became so bad that all family and friends left the residence. Owens said that she contacted [JM] this morning to check on her and [JM] asked her to pick her up and take her to the store. Owens said that she took [JM] to the store and [JM] asked her to go riding that she did not want to go home but Owens said that she had to get back home and told her she would come back by in a little while. Owens said that she went back around 1330 and as she was walking up to the front door she could hear [JM] and Anderson arguing again. Owens said that she stood at the storm door (inside door open) and tried to listen to what was being said. Owens said that she knocked on the door and came over and opened the storm door. Owens said that said "this is not a good time can you come back" so Owens said ok I will come back later. Owens said that Anderson slammed the inside door closed but it bounced back and stayed open. Owens said that she stood there to make sure [JM] was all right and she heard [JM] say "you broke my cell phone" and Anderson said "I didn't break your fucking phone", Owens said she then heard six to seven gun shots.

> Owens said that she could see inside the residence and saw the muzzle flash from a gun but did not see who was holding the gun or where the shots were going. Owens said that Anderson walked over to her at the door with his hands inside the pocket of his pull over hoodie. Owens said that she asked Anderson if that was gunshots and he said no at first then he said yes. Owens said that she asked where [JM] was and Anderson said "it doesn't look good for her can you get some help" and pulled a tan semiautomatic pistol out of the pocket in his right hand. Owens said that she was backing away as Anderson said he needed a ride to Charleston to talk to his mother before he turned himself in and she said no she was going to get help. Owens said that as she was pulling away Anderson was walking out of the residence.

> Officers were contacted by Mose Daniels who said that he left the residence a short time before the shooting to buy more liquor. Daniels said that he left for about

twenty to twenty-five minutes and when he returned officers were there. Daniels said that prior to leaving [JM] and Anderson was arguing about Anderson having relations with another woman. Daniels said that sons (Carlos Phillips 22 yoa and Jamarion Anderson 11 yoa) were at the residence when he left.

Officers located Carlos and he agreed to come to headquarters to speak with Detective. Carlos said that [JM] and Anderson were arguing over Anderson cheating on [JM] and during that argument Anderson said "somebody going to get killed". Carlos said that the argument became very heated so he got Jamarion up and they walked over to grandma's residence on Greer Street. Jamarion and his 10 yo brother Tyrell were interviewed later and they told investigators that during the argument last night Anderson had a small gun in his pocket and told their mom that he was gonna kill her. They said that during the argument and after they were sleeping Anderson went outside and shot the gun off several times.

At approximately 1544 hours Anderson was arrested in Charleston, MO (2 active felony warrants for his arrest also). Anderson was seated inside an audio/video monitored marked MSHP patrol vehicle. MSHP Investigator David Patton read Anderson his Miranda warning, Anderson said that he would like to speak with an attorney so Patton got out of the vehicle. Anderson got Patton's attention and told him that once they get to Sikeston he would tell him everything he just needed a cigarette before he started talking. Anderson was transported by MSHP Trooper Chronister and Inv. Patton to Sikeston DPS headquarters and brought into the booking area. Inv. Patton and I sat down with him for an interview at 1630 hours.

Anderson said that he and [JM]] got into an argument last night at his son's birthday party over her accusing him of cheating. Anderson said that the argument started against today and [JM] grabbed his gun from a bag that it was in lying on the bed, brought it into the kitchen and pointed it at him. Anderson said that he grabbed it, both of their hands were on the gun with his finger on the trigger the gun went off seven times. Patton asked if the gun was an automatic and Anderson said yes. Patton said "so you pulled the trigger one time and the gun went off seven times and Anderson said yes." Anderson said that he purchased the gun off the street about two months ago for protection. Anderson said that he kept the gun on his person for protection. Anderson said that he did tell [JM] that he was gonna kill her last night but that was a common thing they told each other. Anderson said that he only went outside one last time last night and fired the weapon to make sure that it worked because he had not had a chance to shoot it. Anderson was asked what happened to the gun after the shooting and he said that it fell to the floor and he left it there when he left the residence.

We have Anderson a break for a few minutes and went back in. We confronted Anderson with what Owens told us and he changed his story. Anderson said that he did carry the gun to the front door and showed the fun to Owens but he could not remember what he did with it. We told him that his story about them both holding the gun and it going off would be easy to prove right or wrong. Anderson said "ok I will tell you the truth." Anderson said that [JM] did bring the gun out of the bedroom and he grabbed it from her and shot her that he was the only one holding

12

the gun. Anderson said that he touched [JM's] stomach to see if she was alive and she wasn't so he knew she was gone (deceased). Anderson said that he did not make any statement about someone going to die but did say that he just lost it and was tired of being accused of flirting with [JM's] friends or cheating on her. Anderson said that he threw the fun over a fence on Ruth Street but when Anderson was taken down there he couldn't remember where.

*Id.*

On March 15, 2019, an Information was filed against plaintiff charging him with the same charges as those in the criminal complaint. *State v. Anderson*, No. 19SO-CR00038-01 (33rd Jud. Cir., Scott County Court). On March 27, 2019, plaintiff's counsel filed a motion for change of venue, and the Court granted the motion and transferred the action to Butler County, Missouri on March 28, 2019. *Id.*

An Amended Information was filed prior to the plaintiff entering a plea on or about May 12, 2020. The Amended Information charged plaintiff with felony murder in the second degree, armed criminal action and unlawful use of a weapon. *State v. Anderson*, No. 19BT-CR00552 (36th Jud. Cir., Butler County Court). Plaintiff pled guilty on that same date to felony murder in the second degree and was sentenced to twenty-two years in the Missouri Department of Corrections. *Id.* An Order for Transport to the Missouri Department of Corrections was issued on the date of sentencing, May 12, 2020.

### Legal Standard on Initial Review

Under 28 U.S.C. § 1915(e)(2), the Court is required to dismiss a complaint filed in forma pauperis if it is frivolous, malicious, or fails to state a claim upon which relief may be granted. An action is frivolous if it "lacks an arguable basis in either law or fact." *Neitzke v. Williams*, 490 U.S. 319, 328 (1989). An action fails to state a claim upon which relief may be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

13

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Determining whether a complaint states a plausible claim for relief is a context-specific task that requires the reviewing court to draw upon judicial experience and common sense. *Id.* at 679. The court must assume the veracity of well-pleaded facts but need not accept as true "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* at 678 (citing *Twombly*, 550 U.S. at 555).

This Court must liberally construe complaints filed by laypeople. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). This means that "if the essence of an allegation is discernible," the court should "construe the complaint in a way that permits the layperson's claim to be considered within the proper legal framework." *Solomon v. Petray*, 795 F.3d 777, 787 (8th Cir. 2015) (quoting *Stone v. Harry*, 364 F.3d 912, 914 (8th Cir. 2004)). However, even self-represented complaints must allege facts which, if true, state a claim for relief as a matter of law. *Martin v. Aubuchon*, 623 F.2d 1282, 1286 (8th Cir. 1980). Federal courts are not required to assume facts that are not alleged, *Stone*, 364 F.3d at 914-15, nor are they required to interpret procedural rules to excuse mistakes by those who proceed without counsel. *See McNeil v. United States*, 508 U.S. 106, 113 (1993).

## Discussion

Plaintiff is a self-represented litigant currently incarcerated at Southeast Correctional Center (SECC) who brings this civil action pursuant to 42 U.S.C. § 1983. Because he is proceeding in forma pauperis, the Court has reviewed his complaint under 28 U.S.C. § 1915. Based on that review, and for the reasons discussed below, the Court will dismiss his official capacity claims against defendants. Plaintiff's medical malpractice claim against Joseph Telker-Hernandez will also be dismissed, as will any claim plaintiff purportedly attempts to bring against Telker-Hernandez pursuant to 42 U.S.C. § 1983. Additionally, plaintiff's First Amendment access to

14

Courts claim relating to his time at the Scott County Jail is also subject to dismissal. The Court will dismiss plaintiff's claim that defendants Wes Drury and Amy Johnson were deliberately indifferent to his serious medical needs between January 15, 2019, and January 28, 2019, at Scott County Jail. However, the Court will issue process as to plaintiff's claim that defendants Wes Drury and Amy Johnson were deliberately indifferent to his serious medical needs when they failed to give him his prescribed medication after February 4, 2019, at Scott County Jail.

### A. Plaintiff's Claims Against Joseph Telker-Hernandez

Plaintiff asserts that he is bringing a "denial of appropriate medical care" claim against Joseph Telker-Hernandez, the Licensed Professional Counselor who did a mental health evaluation on him on January 3, 2019, at Missouri Delta Medical Center in Sikeston, Missouri. Plaintiff also refers to his claim against Telker-Hernandez as "medical malpractice" and "reckless disregard." However, plaintiff has indicated that he is pursuing claims against all the defendants under 42 U.S.C. § 1983 under the Fourteenth Amendment. Therefore, the Court will address plaintiff's claims against Joseph Telker-Hernandez under both § 1983 and the Missouri common law.

To state a claim for relief under 42 U.S.C. § 1983, "a plaintiff must allege sufficient facts to show (1) that the defendants acted under color of state law, and (2) that the alleged wrongful conduct deprived the plaintiff of a constitutionally protected federal right." *Zutz v. Nelson*, 601 F.3d 842, 848 (8th Cir. 2010). To that end, a defendant can only be held liable pursuant to § 1983 for actions taken under color of state law. *Carlson v. Roetzel & Andress*, 552 F.3d 648, 650 (8th Cir. 2008); *see also Magee v. Trustees of Hamline Univ., Minn.*, 747 F.3d 532, 535 (8th Cir. 2014) (stating that § 1983 "imposes liability for certain actions taken under color of law that deprive a person of a right secured by the Constitution and laws of the United States"); *Sanders v. Sears, Roebuck & Co.*, 984 F.2d 972, 975 (8th Cir. 1993) (stating that § 1983 secures constitutional rights from government infringement, not infringement by private parties); *Montano v. Hedgepeth*, 120

F.3d 844, 848 (8th Cir. 1997) (stating that pursuant to § 1983, "the challenged conduct must have been committed by one who acts under color of law").

"Under [the Supreme] Court's cases, a private entity can qualify as a state actor in a few limited circumstances - including, for example, (i) when the private entity performs a traditional, exclusive public function; (ii) when the government compels the private entity to take a particular action; or (iii) when the government acts jointly with the private entity." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019) (citations omitted); *see Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980) ("Private persons, jointly engaged with state officials in the challenged action, are acting [ ] 'under color' of [state] law for purposes of § 1983 actions.").

Neither Joseph Telker-Hernandez nor the Missouri Delta Medical Center, his employer, could be said to either be employees of the State of Missouri, compelled by the State to take a particular action, performing a traditional, exclusive public function or acting in concert with the State of Missouri such that they can be said to be "state actors." *See, e.g., Gibson v. Regions Fin. Corp.,* 557 F.3d 842, 846 (8th Cir. 2009); *see also, Jones v. Diner*, No. 4:09CV00204 JMM, 2009 WL 1285842, at *2 (E.D. Ark. May 5, 2009) (collecting cases to show that private physicians who participate in involuntary commitments cannot be held liable under 42 U.S.C. § 1983). As such, there is no indication that Telker-Hernandez should or could be held liable under § 1983 as a state actor in this action.

Additionally, to the extent plaintiff is seeking to assert a state law medical malpractice claim against Telker-Hernandez, his claim is also subject to dismissal. Missouri Revised Statute § 538.225 states:

> In any action against a health care provider for damages for personal injury or death on account of the rendering of or failure to render health care services, the plaintiff . . . shall file an affidavit with the court stating that he or she has obtained the written opinion of a legally qualified health care provider which states that the defendant health care provider failed to use such care as a reasonably prudent and careful health care provider would have under similar circumstances and that such failure

. . . directly caused or directly contributed to cause the damages claimed in the petition.

. . .

Such affidavit shall be filed no later than ninety days after the filing of the petition.
. . .

If the plaintiff or his attorney fails to file such affidavit the court shall, upon motion of any party, dismiss the action against such moving party without prejudice.

Mo.Rev.Stat. § 538.225. Plaintiff has not filed a health care affidavit, and ninety (90) days has passed since the filing of his suit. As such, plaintiff's medical malpractice is subject to dismissal.[4]

## B. Official Capacity Claims Against Defendants Amy Johnson and Wes Drury

Plaintiff sues defendants Amy Johnson, Jail Administrator of the Scott County Jail, and Sheriff Wes Drury of the Scott County Sheriff's Office, in their individual and official capacities. The Court will first address plaintiff's claims against these defendants in their official capacities.

A suit against a government official in his official capacity is functionally equivalent to a suit against the employing governmental entity. *King v. City of Crestwood, Mo.,* 899 F.3d 643, 650 (8th Cir. 2018). To the extent plaintiff is asserting a claim against the Scott County Jail or the Scott County Sheriff's Department, these claims are subject to dismissal because neither the Jail nor the Sheriff's Department are legal entities amenable to suit. *See Owens v. Scott Cty. Jail*, 328 F.3d

---

[4]The Court additionally finds that to the extent plaintiff is attempting to attack his guilty plea and conviction from May 12, 2020, in *State v. Anderson,* No. 19BT-CR00552 (36th Jud. Cir., Butler County Court), by asserting that Joseph Telker-Hernandez was responsible for the murder of Jennifer Midgett, he is estopped from arguing such. Plaintiff pled guilty to this crime in 2020 and is therefore *Heck*-barred from relitigating his guilt. *See Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994) (finding that a prisoner may not recover damages in a § 1983 suit where the judgment would necessarily imply the invalidity of his conviction, continued imprisonment or sentence unless the conviction or sentence is reversed, expunged or called into question by issuance of a writ of habeas corpus); *see also Edwards v. Balisok*, 520 U.S. 641, 648 (1997) (applying rule in § 1983 suit seeking declaratory relief) and *Schafer v. Moore*, 46 F.3d 43, 45 (8th Cir. 1995). Furthermore, allowing plaintiff to assert facts contrary to his guilty plea in this litigation would be improper given that plaintiff seeks damages from the homicide of his girlfriend, a crime which he committed and plead guilty to. *See, e.g., James v. Paul*, 49 S.W.3d 678 (Mo. banc) (noting that guilty plea can be conclusive for purposes of the defensive use of non-mutual collateral estoppel; plea is not merely admissible evidence).

17

1026, 1027 (8th Cir. 2003). *See also Ketchum v. City of West Memphis, Ark.,* 974 F.2d 81, 82 (8th Cir. 1992) (stating that "departments or subdivisions" of local government are not "juridical entities suable as such"); and *De La Garza v. Kandiyohi Cty. Jail*, 18 Fed. Appx. 436, 437 (8th Cir. 2001) (affirming district court dismissal of county jail and sheriff's department as parties because they are not suable entities).

Even if the Court substituted Scott County in place of the Scott County Jail and/or Scott County Sheriff's Department, plaintiff's claims would be unavailing. Plaintiff has not alleged that his claims against Amy Johnson and/or Wes Drury arose because of an unconstitutional policy or custom of the Scott County Jail, Scott County Sheriff's Department or Scott County, Missouri. A political subdivision generally cannot be held vicariously liable under 42 U.S.C. § 1983 for unconstitutional acts performed by its employees. *See Johnson v. Outboard Marine Corp.,* 172 F.3d 531, 535 (8th Cir. 1999) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).

A political subdivision can only be held liable under § 1983 if a constitutional violation resulted from an official policy, custom, or a deliberately indifferent failure to train or supervise. *Id.*; *Mick v. Raines*, 883 F.3d 1075, 1079 (8th Cir. 2018). *See also Marsh v. Phelps Cty.*, 902 F.3d 745, 751 (8th Cir. 2018) (recognizing "claims challenging an unconstitutional policy or custom, or those based on a theory of inadequate training, which is an extension of the same.

Here, plaintiff's facts do not point to the existence of any "policy statement, ordinance, regulation, or decision officially adopted and promulgated by [Scott County, Missouri] governing body" as being at issue in this case. *See Angarita v. St. Louis Cty.,* 981 F.2d 1537, 1546 (8th Cir. 1992). He does not claim that Scott County had a policy or custom of failing to treat his mental health needs properly because of "a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *See Corwin v. City of Independence, Mo.,* 829 F.3d 695, 700 (8th Cir. 2016). Plaintiff also has not established the

"existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by" the County's employees, much less that policymaking officials were deliberately indifferent to or tacitly authorized such misconduct.

In fact, plaintiff alleges that he was kept in a suicide cell due to his mental health needs for thirteen (13) days immediately after being taken to Scott County Jail in January 2019. He simply argues that he should have *also* been provided mental health counseling, as well as psychotropic medication, *in addition*, to being kept in the suicide cell at the Scott County Jail, after he was taken there. This issue does not demonstrate a custom or policy claim. *See Johnson v. Douglas Cty. Med. Dep't,* 725 F.3d 825, 828 (8th Cir. 2013).

Similarly, plaintiff has not alleged a policy or custom claim when he asserts that Wes Drury failed to approve his receipt of Haldol when he came back from Fulton Psychiatric Hospital on February 4, 2019, and was placed on suicide watch for fifteen (15) days. Plaintiff does not indicate any other facts relative to this claim, or how or why he failed to receive the Haldol after this time.

Furthermore, plaintiff has not demonstrated that the Scott County Jail was deliberately indifferent in failing to train or supervise its employees – namely Wes Drury or Jail Administrator Amy Johnson. That is, plaintiff has not shown that Scott County, Missouri "had notice that its procedures were inadequate and likely to result in a violation of constitutional rights." *See Jennings v. Wentzville R-IV Sch. Dist.,* 397 F.3d 1118, 1122 (8th Cir. 2005).

For these reasons, plaintiff has failed to state a claim against either Scott County Jail or Scott County, Missouri. *See Ulrich v. Pope Cty.,* 715 F.3d 1054, 1061 (8th Cir. 2013) (affirming district court's dismissal of *Monell* claim where plaintiff "alleged no facts in his complaint that would demonstrate the existence of a policy or custom" that caused the alleged deprivation of plaintiff's rights). Based on the aforementioned, the Court is unable to say that plaintiff has alleged an official capacity claim against defendants Wes Drury or Amy Johnson.

### C. Individual Capacity Claims

#### 1. *Access to Courts*

Plaintiff next argues that his lack of access to pencils in his suicide cell, as well as his lack of access to the law library, prevented him from being able to access the courts. However, he does not provide any facts to support his assertion that he was denied access to the Courts.

The Eighth Circuit has recognized that, when bringing an access to courts claim, it is insufficient to merely allege a denial of access to a law library or other resources, even if the denial is systemic. *Sabers v. Delano*, 100 F.3d 82, 84 (8th Cir. 1996) (per curiam) (citing *Lewis v. Casey*, 518 U.S. 343, 351 (1996)). Instead, a plaintiff must plead that the lack of the library or other resource deprived him of some specific opportunity to defend himself, or advance a viable legal claim, in a criminal appeal, postconviction matter, or civil rights action seeking to vindicate constitutional rights. *Id*. Speculation that injuries might occur or could have occurred is insufficient. *See Hartsfield v. Nichols*, 511 F.3d 826, 833 (8th Cir. 2008) ("[a]bsent an articulation of how the alleged wrongful conduct actually blocked [the inmate's] access to filing a complaint, or caused a filed complaint to be deficient, [the inmate's] alleged injuries are merely speculative"). Because plaintiff fails to allege that he suffered actual prejudice with respect to contemplated or existing litigation, this claim must be dismissed.

#### 2. *Deliberate Indifference to Plaintiff's Serious Medical Needs*

Plaintiff sues both Sheriff Wes Drury and Jail Administrator Amy Johnson, in their individual capacities, for deliberate indifference to his serious medical needs. His claim consists of two instances of deliberate indifference. The Court will address each instance separately.

Plaintiff first alleges that when he was taken to Scott County Jail he was "placed under the supervision" of Johnson and Drury. He claims that he was:

held in a jail cell with a camera on him – from 01-15-2019 to 01-28-2019 – 'a total of thirteen days' before Amy Johnson and Wes Drury took any action for mental health help for plaintiff.

Plaintiff's complaint, however, is devoid of any factual assertions of what exactly occurred to him during these thirteen (13) days. He simply states:

> For thirteen days (before being transported) he was being held in a strip-suicide cell with no visits; no phone calls, no type of medications; plaintiff suffered from denial of mental health treatment (medications), suffered from evidence of pain, humiliation, emotional distress, mental anguish, nightmares, and memory loss.

According to the medical notes provided by plaintiff, as well as his own allegations, from January 15, 2019, to approximately January 24, 2019, or for approximately nine (9) days, plaintiff was kept in what the Court would refer to as a "suicide cell," with constant video surveillance. Although plaintiff complains that he was not allowed visits from family, his sister was obviously aware that he was *not* receiving psychiatric medications during his first nine (9) days at Scott County Jail, and she called the Jail's clinic coordinator, Edie Eeftink on January 24, 2019, to inquire about having plaintiff placed on psychiatric medications, because she for some reason believed he needed them.

The clinic coordinator, on that same date, January 24, 2019, called a Licensed Professional Counselor at Bootheel Counseling Center, Angela Lutmer, to seek assistance with plaintiff's care. Although it was not until January 28, 2019, that Lutmer went to visit plaintiff at the Jail to evaluate him, or approximately four (4) days later, plaintiff was transferred the very next day to Fulton Hospital for a 96-hour hold to be evaluated. However, plaintiff admitted to Lutmer during his interview with her on January 28, 2019, that he had not wanted to tell Jail officials that he was suicidal or homicidal prior to that time because he did not want to be in an actual suicide cell. Thus, plaintiff admits he did not want Jail officials to know of his alleged poor mental state because he did not want to be placed in a "suicide cell." Plaintiff does not indicate in his complaint or

21

supplemental documents that he sought treatment from Jail officials prior to that date, or that he asked for mental health assistance or psychiatric medication.

The Fourteenth Amendment's Due Process Clause is used to evaluate a pretrial detainee's claims of deliberate indifference, whereas the Eighth Amendment is used to evaluate claims of convicted prisoners. *See Stearns v. Inmate Servs. Corp.,* 957 F.3d 902, 906 (8th Cir. 2020). However, this distinction "makes little difference as a practical matter," because the same standard is applied. *Kahle v. Leonard,* 477 F.3d 544, 550 (8th Cir. 2007) ("Pretrial detainees are entitled to the same protection under the Fourteenth Amendment as imprisoned convicts receive under the Eighth Amendment."); *see also Vaughn v. Greene Cnty.,* 438 F.3d 845, 850 (8th Cir. 2006) ("Although this court has yet to establish a clear standard [for medical mistreatment] for pretrial detainees, we repeatedly have applied the same 'deliberate indifference' standard as is applied to Eighth Amendment claims made by convicted inmates."); *Hartsfield v. Colburn,* 371 F.3d 454, 457 (8th Cir. 2004) (applying the Eighth Amendment deliberate indifference analysis to a pretrial detainee's Fourteenth Amendment claim).

The Eighth Amendment prohibits cruel and unusual punishment, and limits conditions of confinement. *Robinson v. California*, 370 U.S. 660 (1962); *Rhodes v. Chapman*, 452 U.S. 337 (1981). The Supreme Court has explained this limit as a prohibition on punishments that "involve the unnecessary and wanton infliction of pain" including those that are "totally without penological justification." *Rhodes*, 452 U.S. at 346 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173, 183 (1976)). A jail official's intentional denial of, or delayed access to, medical care for a prisoner's serious injury constitutes unnecessary and wanton infliction of pain, giving rise to a claim of deliberate indifference to that prisoner's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). To prevail on a claim of deliberate indifference, a plaintiff must prove that he suffered from an objectively serious medical need, and that prison officials actually knew of and

deliberately disregarded that need. *Roberts v. Kopel*, 917 F.3d 1039, 1042 (8th Cir. 2019). "[D]eliberate indifference requires a highly culpable state of mind approaching actual intent." *Kulkay v. Roy*, 847 F.3d 637, 643 (8th Cir. 2017) (quoted case omitted). An inmate must demonstrate that a prison health care provider's actions were "so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care." *Jackson v. Buckman*, 756 F.3d 1060, 1066 (8th Cir. 2014) (quoted case omitted). Thus, a showing of deliberate indifference requires more than a mere disagreement with treatment decisions and is greater than gross negligence. *Gibson v. Weber*, 433 F.3d 642, 646 (8th Cir. 2006). "A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997). Deliberate indifference can include the intentional denial or delay of access to medical care, or the intentional interference with treatment or prescribed medication. *Vaughn v. Lacey*, 49 F.3d 1344, 1346 (8th Cir. 1995).

In this case, as to the first allegation of deliberate indifference, or the time period when plaintiff was allegedly kept in the "suicide cell" at the Scott County Jail between January 15, 2019, and January 28, 2019, plaintiff has not specifically alleged that he sought mental health or psychiatric treatment and was denied such treatment by Wes Drury and Amy Johnson.[5] In fact, as noted above, he indicated to Lutmer that he kept knowledge of his suicidal and homicidal thoughts to himself to avoid being placed in a "suicide" cell. Thus, the Court cannot find that Drury and Johnson acted with deliberate indifference to plaintiff's serious medical needs between January

---

[5]Moreover, plaintiff does not identify any particular person or persons at the Jail who refused him medical or mental health treatment after he sought such treatment. Thus, he provides no allegations that any individual's actions were "so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care," which is necessary to demonstrate deliberate indifference. Furthermore, his ambiguous allegations do not satisfy the 42 U.S.C. § 1983 requirement that plaintiff establish a defendant's "causal link to, and direct responsibility for, the deprivation of rights." *See Mayorga v. Missouri*, 442 F.3d 1128, 1132 (8th Cir. 2006).

15, 2019, and January 28, 2019. Plaintiff's conclusory allegations that defendants acted with deliberate indifference to his serious medical needs, therefore, fails to state a claim for relief. *See Torti v. Hoag*, 868 F.3d 666, 671 (8th Cir. 2017) ("Courts are not bound to accept as true a legal conclusion couched as a factual allegation, and factual allegations must be enough to raise a right to relief above the speculative level").

For plaintiff's second deliberate indifference claim against Drury and Johnson, he asserts that when he was returned to Scott County Jail on February 4, 2019, he was released on one psychiatric drug, Haldol. Plaintiff was also released on two blood pressure medications, Lisinopril and Amlodipine, a diuretic called Hydrochlorothiazide, Zantac for GERD, and an anti-seizure medicine called Lamictal.

Under the "Physician Comments" portion of plaintiff's discharge papers, the notes stated, "Do not provide patient with objects that he can use to hurt himself. He needs to take his medication as prescribed. He needs to be followed up by a psychiatrist and internist for medication management." Plaintiff states in his complaint, however, that when he returned to Scott County Jail on February 4, 2019, he was placed in a "suicide watch cell," but for "multiple days" he did not receive his medications. When he asked defendant Johnson about his medication, Johnson told him that she was waiting for Drury to approve the Jail's nurse to give plaintiff the medication. Plaintiff specifically states that fifteen (15) days went by before "The Jail" approved the nurse to give plaintiff his needed medication.

There is some discrepancy in the record plaintiff has provided to the Court on this issue, as in the progress note provided by plaintiff to the Court filled out by Licensed Professional Counselor Angela Lutmer, dated February 11, 2019, the note states:

> Clinician was informed by nurse at Scott County Detention Center that client was back from Fulton, had started medications and appeared to be doing better. Client is concerned about continuing medications if he is transferred to a new jail due to change in venue on his court case.

24

Because Court does not have plaintiff's medical records to substantiate when plaintiff received his medications from the Jail after his return from Fulton State Hospital, the Court will issue process as to plaintiff's claim of deliberate indifference against Wes Drury and Amy Johnson on this issue, in their individual capacities.

### Motion for Order as to Statute of Limitations

On October 17, 2023, simultaneously with his complaint in this action, plaintiff filed a "motion for order" seeking a finding from this Court that his claims in this case would not be barred by any statutes of limitations. [ECF No. 4]. In his motion, he states:

> Plaintiff, Jeffery L. Anderson was kept confined in a empty suicide cell. Was mentally unstable. And the Covid-19 epidemic was active. Comes now the plaintiff pleading the honorable court to release any such statute of limitation against this above case.

The Court declines to rule on any matters relating to the statute of limitations in this preservice order, especially in such a situation where issues of fact could arise as to equitable tolling. As such, the Court will deny plaintiff's motion without prejudice at this time.

### Motion for Appointment of Counsel

Plaintiff has filed a motion for appointment of counsel. [ECF No. 3]. The motion will be denied at this time. In civil cases, a pro se litigant does not have a constitutional or statutory right to appointed counsel. *Ward v. Smith*, 721 F.3d 940, 942 (8th Cir. 2013). *See also Stevens v. Redwing*, 146 F.3d 538, 546 (8th Cir. 1998) (stating that "[a] pro se litigant has no statutory or constitutional right to have counsel appointed in a civil case"). Rather, a district court may appoint counsel in a civil case if the court is "convinced that an indigent plaintiff has stated a non-frivolous claim…and where the nature of the litigation is such that plaintiff as well as the court will benefit from the assistance of counsel." *Patterson v. Kelley*, 902 F.3d 845, 850 (8th Cir. 2018). When determining whether to appoint counsel for an indigent litigant, a court considers relevant factors

such as the complexity of the case, the ability of the pro se litigant to investigate the facts, the existence of conflicting testimony, and the ability of the pro se litigant to present his or her claim. *Phillips v. Jasper Cty. Jail*, 437 F.3d 791, 794 (8th Cir. 2006).

After reviewing these factors, the Court finds that the appointment of counsel is not warranted at this time. Plaintiff has demonstrated, at this point, that he can adequately present his claims to the Court. Additionally, neither the factual nor the legal issues in this case appear to be complex. The Court will entertain future motions for appointment of counsel as the case progresses.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiff's motion for leave to proceed in forma pauperis [ECF No. 2] is **GRANTED**. *See* 28 U.S.C. § 1915(a)(1).

**IT IS FURTHER ORDERED** that the plaintiff shall pay an initial filing fee of $1.00 within thirty (30) days of the date of this Order. Plaintiff is instructed to make his remittance payable to "Clerk, United States District Court," and to include upon it: (1) his name; (2) his prison registration number; (3) the case number; and (4) that the remittance is for an original proceeding.

**IT IS FURTHER ORDERED** that the Clerk of Court shall issue summons on the complaint as to defendants Amy Johnson and Wes Drury in their individual capacities, on plaintiff's claim that defendants Wes Drury and Amy Johnson were deliberately indifferent to his serious medical needs when they failed to give him his prescribed medication after February 4, 2019, at Scott County Jail.

**IT IS FURTHER ORDERED** that because plaintiff is proceeding in forma pauperis in this action, service shall be effectuated by the United States Marshals Service through summons, pursuant to Fed. R. Civ. P. 4. *See* 28 U.S.C. §1915. Defendants Wes Drury and Amy Johnson

shall be served with summons by the United States Marshals at the Scott County Sheriff's Office at 131 S. New Madrid Street, Benton, Missouri, 63736.

**IT IS FURTHER ORDERED** that a copy of the summons and return of summons shall be filed in this matter.

**IT IS FURTHER ORDERED** that plaintiff's claims brought against defendant Joseph Telker-Hernandez are **DISMISSED** for failure to state a claim. 28 U.S.C. § 1915(e)(2)(B).

**IT IS FURTHER ORDERED** that plaintiff's claim against defendants in their official capacities are **DISMISSED** for failure to state a claim. 28 U.S.C. § 1915(e)(2)(B).

**IT IS FURTHER ORDERED** that plaintiff's First Amendment access to courts claim is **DISMISSED** for failure to state a claim. 28 U.S.C. § 1915(e)(2)(B).

**IT IS FURTHER ORDERED** that plaintiff's claims against defendants Amy Johnson and Wes Drury for deliberate indifference to his serious medical needs relating to his claim that he failed to receive treatment at Scott County Jail between the dates January 15, 2019, and January 28, 2019, are **DISMISSED** for failure to state a claim. 28 U.S.C. § 1915(e)(2)(B).

**IT IS FURTHER ORDERED** that plaintiff's motion for appointment of counsel [ECF No. 3] is **DENIED at this time**.

**IT IS FURTHER ORDERED** that plaintiff's motion for order to disregard the statute of limitations with respect to his claims [ECF No. 4] is **DENIED AS MOOT**. Plaintiff's claims brought pursuant to 42 U.S.C. § 1983 are subject to a five-year statute of limitations and he filed this action in a timely manner.

**IT IS FURTHER ORDERED** that an appeal of this Order would not be taken in good faith.

An Order of Partial Dismissal will accompany this Memorandum and Order.

Dated this 18th day of June, 2024.

_____

STEPHEN N. LIMBAUGH, JR
SENIOR UNITED STATES DISTRICT JUDGE